May it please the Court, I'm here for the appellant. And your name is? David Rifkin, forgive me, Your Honor. There's a short and a long way to approach this appeal. The short way is to hold that the government has conceded the sole argument that it made below in support of its motion for summary judgment concerning Mr. Nicholas's risk of loss. The long way is to address the broader issue of partnership recognition writ large, raise for the first time an appeal and hold that the evidence, particularly including the evidence that Mr. Nicholas and his partners jointly labored for years to carry out their business purpose of collecting distressed debt more than establishes a fact issue under the Culbertson standard that precludes summary judgment. I'll address both issues, but let me begin with the short one since this presents the most straightforward way to resolve this appeal. Henry Nicholas and his partners joined the Broadwood Fund to collect on Chinese and Korean distressed debt assets and to share in the profits and losses of that venture. The argument made below by the government was that the funds were not through partnerships because Mr. Nicholas did not have a risk of economic loss. The government now concedes in its appellate brief that Nicholas not only faced the risk of economic loss, but also suffered millions of dollars in losses. Isn't there more than one way to understand what is meant by economic loss, though? So one way would be that he might lose the six million or so dollars that were invested in cash essentially here. But the other way is that overall in this whole transaction, when you include his the tax gains that he gets from this transaction, that he would actually have a risk of loss. And isn't it the case that overall, when you consider the tax benefits, there's no possible way he'd have a loss? A couple of points, Judge Friedland. First of all, the government did not. What you are, in fact, espousing is the way you would approach the risk and economic loss in the context of a Culbertson all facts and circumstances test. The government, however, would define economic loss primarily, if I may call it from what they put in their summary judgment notion. Is the United States entitled to judgment as a matter of law? Because Nicholas had no risk of economic loss when he purchased 99 percent interest in his petitioners. The government put it the same way in their memorandum. But I don't when I read that, I'm not sure which one of these two they meant. How do you know that that means the laws? Forgive me, Your Honor, because the government dwelt very heavily on the welcome letter. Counsel, just to advise you, when you interrupt a judge, it's both impolite when you say forgive me and then keep on talking. You're ignoring the opportunity to hear what the judge is asking. So I know you're passionate about your client, but you may want to slow down and let the judges finish their questions. This is a very complicated case. Thank you, Your Honor. So I'd like to know how you know that when what the government said there meant this loss of six million instead of loss overall. We know that, Your Honor, because the government below emphasized in its papers one particular reason why Mr. Nicholas had no risk of economic loss. That everything to do with one paragraph in the welcome letter that in the government's view purported to show that he could exchange his investments in the December of 2001 without suffering risk of economic loss. We put forward ample evidence that it is not the proper reading of the welcome letter, that Mr. Nicholas actually did not own any assets, any partnership assets in 2001. What happened was that Chenery put forward a proposed asset allocation that was when finalized by Mr. Nicholas. That is why we know that. But if I may... So say we agree with you that that letter doesn't mean as much as the district court and the government seem to think. I'm not sure the fact that they cited a letter and tried to make a better argument out of it than maybe it supports means that their entire theory was different than the sort of obvious theory here that there's no way he could lose because he was getting such a huge tax benefit. Yes, Your Honor. Well, a couple of things. At the summary judgment phase, we're presented with a comprehensive Culbertson test, which the government cited in a proper form and fashion, but really did not elaborate. You're supposed to look at everything, all the factors that go to the intent of the parties that have entered into the partnership. The government has conspicuously failed to do that. So I'm struggling with this because, you know, you are the appellant. So you have to convince us that there's no ground to affirm the district court here. And in your opening brief, you didn't talk about Culbertson. You didn't talk about all these factors. The only thing you talked about is risk of loss. And if we think you're wrong about risk of loss, why shouldn't we say that you haven't shown that the district court was wrong and just affirm here? Your Honor, our burden at the summary judgment phase were quite slight. All we had to do is to point out there's more than a scintilla of evidence, but there's a disputed issue of material fact. In our view, the government's unfolding of a single-factor crept approach to risk of economic loss is precisely that situation. And if I may just briefly mention that the Culbertson test that is illustrative points out that you need to enter for, in good faith, for a purpose of sharing either losses or gains or both. So even in a situation where Mr. Nicholas could not possibly share in losses, to the extent there was a tremendous upside that we demonstrated, even in the record, what was not tailored for that purpose below, we more than established a disputed issue of material fact. But if I may actually... Wait, wait, how? What did you point to? I mean, none of the partners had a risk of loss, right, because they were compensated. So Chenery was getting fees that more than compensated for the investment, and the foreign investor got its market value up front, and Nicholas had no risk of loss because of the tax. So how did you show that anyone might lose here? We emphasized, Your Honor, the prospects of profit. We emphasized it both by explaining the intense due diligence that was conducted before, but we also emphasized, and this is the key aspect of a partnership, that they labored for years as demonstrated in Chenery's quarterly reports and trying to collect the distressed assets that they suffered losses, and, in fact, losses were so distributed. But let me try to answer your question better. It's the relationship between 6 million and the prospects of tax benefits. It is a black-letter law that having a tax purpose does not disqualify a partnership. If any other arrangement provided, you'd also have a business purpose. The fact is that the risk of economic loss concerning 6 million was very real, and Mr. Nicholas, in fact, lost money. Chenery lost money, although not as much, but in proportion to their capital balance. Foreign partners, in fact, lost money. To me, the fact that there are different aspects of the overarching business where you had a possibility of experiencing, and, incidentally, we point out below our expert, Paul Irving, and this is interesting because the government, of course, magically, magic incantations, shelter, shelter, shelter. Not only did Mr. Nicholas not take any economic losses, book any economic losses in 2001, which he couldn't, of course, because he had no assets. He had no opportunity to book economic losses in 2002, 2003, 2004 because of the fact that he could not, given his overall tax situation, he could not book economic losses. So this is a partnership where Mr. Nicholas and Albers have joined in for a period of years, hoping to realize tremendous gains because they believe they purchased, of course, distressing portfolios of good nuggets that would enable them to realize that loss. So to me, just like, if I may put it this way, just because the tax purpose does not disqualify a partnership from being recognized, if a business purpose is present, it necessarily means that opportunity to experience tax losses, not a certainty, but opportunity, does not mean that it had no loss of loss when your investment, $6 million, which is a lot of money for any taxpayer, is at risk, and more than that because partnership could have had additional calls for capital, partnership could have incurred debt, et cetera, et cetera. Should our inquiry about the $6 million be did they actually expect to make more than $6 million back? I mean, do we have evidence here that the partners had any kind of reasonable expectation that this might actually make more than $6 million back? Absolutely, which is also shown by the fact that there were fees associated with running for partnership and collection efforts. Again, look, the record shows that despite the highly speculative nature of his investment, a number of very sophisticated financial players, including major financial institutions, made tons of money because of recovery in Asian markets. So the main evidence that I see you to cite for the idea that he actually expected, that Nicholas actually expected to make money is the deposition testimony where all I read it to say is, if we make money, we're going to make money, essentially. It doesn't really say he expected to or it was likely or anything. So I'm having trouble figuring out, I guess, first, whether that is the right question, whether he expected to make money, and if that is the right question, whether there's really evidence of that at all. Your Honor, the evidence of that is both in prospectus, but not only in that. The fact that the partnership has actually labored for years, diligently trying to collect, unlike all the cases that the government cited, numerous partnership-destroying events like Salvegate or Superior Trading, they labored for years, diligently trying, changing services, realizing some gains, but unfortunately suffering losses. But the fact that they tried to get their money, the $6 million, back, isn't that something you would do anyway? I mean, even if you invested the $6 million only so that you get the tax gains, and if you're Chenery, so you get your fees so that Nicholas can get the tax gains, you still might try to get your $6 million back. I mean, that doesn't mean that the purpose of forming the partnership was anything other than the tax purpose, just because they kind of tried to get the tax purpose for less money overall. We would argue that the expectation by the partners that they would be able to make considerable amount of money, given the nature, highly speculative nature, but the prospect they would be able to get. You cited Salvegate. Do you think the principles that are pretty well articulated in that opinion are valid? We do, Your Honor, and we point out that there are, in effect, four partnership-destroying events that were responsible for the decision of Salvegate, not the way the government reads it, which is to say this was distressed assets, therefore it was a per se tax shelter. And the evidence involved was the fact that the Chinese partner, in effect, was selling assets cheaply, undermining the very business purposes of a partnership. When U.S. partner, Mr. Beale, found out about it and confronted him about it, the Chinese partner threatened to go to IRS. That's not what Salvegate said. Basically, Salvegate said, yeah, there was a valid business purpose going in, but there was no valid partnership interest, and so that's why they struck it down. If I may, Judge Fischer, a reason they struck it down is precisely because subsequent events shown, remember the Culbertson test is essentially a test of intent, which is why the good faith is being mentioned. So subsequent developments, including the one involving Chinese partner, the fact that they went back into another transaction with that partner, the fact that they put $180 million to build up losses that provided absolutely no opportunity for sharing for a partnership, those plus the fact that Salvegate was really irrelevant because you began with Visgate, those four events, I call them partnership-destroying events, is what gave a court comfort to conclude that there was no intent to form a good faith business to share profits or losses. Those are both in my reserve balance of my time. May it please the Court, Richard Farber for the United States. Your Honor, I would emphasize that the issue here isn't whether Mr. Nicholas personally thought he could make money by purchasing distressed assets. This is a tax shelter that is dependent upon the partnership form. What the district court held was, regardless of whether Mr. Nicholas personally thought he could make money by buying debts, the partnership form itself was a sham. That's the same holding of the Fifth Circuit in Southgate which said, yes, the transaction had economic substance. There could be money to be made by Mr. Beale who had made billions, but the partnership form was a sham. When the partnership is disregarded, the artificial losses go out the window, as explained in that opinion and in our brief, and all that is left is- You're relying on Southgate as being an accurate statement of the law? In terms of the Culbertson test, yes, Your Honor. And isn't one of them whether the partners participated in major partnership decisions? Didn't they all participate here? There's no evidence that the foreign entity that is key to this entire shelter, because if the foreign entity is disregarded and it is treated, as we say, just selling its distressed debts to Mr. Nicholas or Mr. Nicholas and Chenery, the artificial tax losses go out. That is why when- Let's go back to Broadwood, which is representative of how this thing worked. Cinder, the company with the non-performing loans, contributed $1.8 million worth of loans to the Broadwood fund, took back 99% interest. Mr. Chenery, it's a company, took back 1%. A few weeks later, as preplanned, Mr. Nicholas purchased 99% of Cinder's interest for $1.8 million. At that point, Cinder is cashed out. It has no longer even a penny invested in this. And I would add that all of Mr. Nicholas's money went to Cinder and the other foreign entities. There was no money in these funds that he was funding to do anything. He put his money directly to the foreign entities. They were all cashed out. Now, why would Cinder and all the other entities left with a 1% interest? They had already been cashed out. What were they going to do? Why were they left with a 1% interest? If they didn't have a 1% interest, there would be no $300 million in artificial losses. Did they receive 1% of the losses or gains from the operations of recovery on the loans? There is no evidence of distributions on the books, of course. They were allocated in proportion. Otherwise, they couldn't even claim they were a partner. But let's get to why- So the answer is yes. On the books, Your Honor, but on the- The books in all these cases treat these entities as valid partnerships. But the law is, are they in substance valid partnerships? It's not enough that they observe the formalities. The question is, in substance, did the parties intend in good faith to join together to conduct a debt collection business and to share profits and losses? Your position is that the 1% partners and the 98% partner never received any cash distributions from the recovery? The cash was allocated on the books of the partnership according to the respective partnership interest. The record doesn't show whether any distributions were made. The point is that SINDA, in Southgate, SINDA was the same foreign entity. In that case, they were cashed out but were left with a 10% interest. Nevertheless, the Fifth Circuit said their 10% interest was a sham because they had been cashed out and they weren't going to do anything for their 10% interest. They were just necessary to be a partner in order to create the artificial losses. Now in Southgate, SINDA was hired as the debt servicing agent and paid 25% commission for going out and collecting the debts. If it was obligated because it had a 10% partnership interest to go out and collect the debt, it wouldn't have been hired and paid 25%. What was the going rate for persons who are debt collectors but are not partners? I don't know, Your Honor. I'm not saying it was unreasonable, but the point is that they had to pay them 25% under a service contract. Now if we get to the facts here, every one of these funds, even though you had a 1% interest for these foreign entities, who my opponent has suggested was charged with the obligation to go out and collect the debt, and there's no evidence of that, there's no agreement showing they were obligated, every one of these funds had a separate debt servicing agreement in which they were paid a fee for actually going out. They were contractors. And in this case, in Broadwood, SINDA again was hired under a separate debt service agreement and paid 15%. And that's on page 197 of the record excerpts. The fee agreement is discussed by one of the fund's experts. Now if they had an obligation because of this puny 1% partnership interest they were left with when they were cashed out to go ahead and collect these debts, which is a difficult job, which they never would have done for 1%, then they wouldn't have been retained and paid 15%, which is further evidence of why this is a sham. They did not intend to go into the debt collection business with Mr. Nicholas. He knew nothing about debt collection. And the record shows, all the documents show that these foreign entities had one intent and one intent only, to sell their distressed assets as quickly as possible. And all the promotional materials provided to Mr. Nicholas said, we have located motivated sellers who have been authorized to begin selling their distressed assets. And that is exactly what happened. So that's what I thought was going on here. But then I was looking at pages 150 to 152 of the record. And there's discussion there about Chenery suing Cinda for selling some of these debts without getting permission from the other partners first. They actually seem to have drafted a complaint that they then decided not to file. McDermott, Will, and Emery had drafted a complaint to sue Cinda. That discussion of suing Cinda because they were somehow acting without approval of the other partners made me wonder actually whether at least Chenery thought there was some cooperation here and some real obligations that Cinda had. Can you explain what was going on with that litigation? I don't know, and my opponent hasn't said anything about it, but I will say this. There is no document which says that in return for leaving Cinda with a 1% partnership interest, they were charged with going out and collecting the debts. And as I said before, if they had that responsibility, then they wouldn't have been hired under a separate debt service contract and paid a 15% commission. Is it your idea that partners among themselves never give a fee to a partner who does an active job as opposed to a silent or partner's job? No, Your Honor. Well, then what's wrong with this? You just told me a moment ago that they were getting paid 20 and 25% in the Southgate case, and Cinda is now getting paid 15% and as a partner. Not as a partner, Your Honor, as a debt servicer. Getting paid 15% as a debt servicer, whereas in the Southgate case they were getting paid more. Well, they negotiated, but there's no... So isn't it possible that the reason that they were taking a lower fee for the debt negotiation in this case is that they were a partner? No, Your Honor. There's a complete absence of evidence, and I would emphasize that the burden of proof as the district court held was on the funds to demonstrate they weren't shams because the commissioner had determined in his final notice of partnership adjustment no evidence was adduced from Cinda or the other foreign entities as to what their role was and why they participated in the venture. None. Zero. No deposition testimony. No documents. Nothing from them. So there's a complete... So that would be complete speculation that, oh, we agreed for 15% because we were given a 1% interest here. Clearly there's no evidence that they wanted to go into the debt collection business with Mr. Nicholas. All the promotional materials which are set forth in the excerpt for record were these were motivated sellers. And you have to remember, Your Honor, as I've emphasized, they were cashed out. Why would they be given a 1% interest when they put in whatever money they put in, they got all of that money out when Mr. Nicholas entered these funds. They were completely cashed out and had no investment. There's no reason to leave them with a 1% other than without that 1%. What was the total value of the bad debts, around $300 or $400 million? Face value or fair market value? Face value. I think about $300 million. All right. 1% of $300 million is $3 million. Excuse me? 1% of $300 million if they get face value is... $300,000. No, it's $300 million. Yeah. $3 million goes a long way, even in China. Your Honor, but they were cashed out. And if there was... Is the government's position that once cashed out, you cannot have any economic interest in making more money, which may be taxable? There's no evidence that they viewed their interest as having any substance that they expected to collect anything above that. Then why did they take it? Just for tax reasons, right? To accommodate Mr. Nicholas, because the only reason... Do you think that reasonable people might see a different intent? Possibly a jury might see that there is some business purpose to this, even though you don't? Your Honor... I'm not saying you're unreasonable. Can I answer that? Yeah. Thank you. If the funds, the appellant, had put on deposition testimony from these foreign entities that the reason, even though we were cashed out, we insisted on getting a 1% was we thought we were going to profit, we would have a different case. I think if you read the district court's opinion, the first part of its holding was it was sufficient to grant the United States summary judgment because the funds did not put on any evidence that the parties intended to join together to go into the debt collection business together. And then the court said, but the government went more, it had due some additional evidence. Now, one of the factors was the welcome letter, but that was only the additional evidence, and I would say there's a lot more in the record if the court looks at it. In particular, the promoters of this case, Chenery and my CFO, repeatedly characterized these funds as sole investor funds. They completely ignored the foreign entities, and they said they're sole investor funds that Chenery had retained a 1% interest so it could manage the funds for the sole investor, and then it disclaimed any ability to manage, saying it had no experience whatsoever managing a distressed asset fund. And in fact, my CFO sent a letter to Nicholas advising him that you were paying substantial up front fees, $2.8 million to Chenery as supposedly the manager, but it has no track record or experience in managing. Now, why would Mr. Nicholas, an experienced businessman, pay Chenery $2.8 million to manage funds when it knows nothing about these funds? Because his scheme was designed to save him $100 million in taxes. That's a wonderful argument, and I think the other side will say you can make that at trial. But the question is, is there any evidence at all which would allow a reasonable juror to find that there was a business purpose to the partnership, using the eight factors of Southgate? The district court said no, there was no evidence that the partnership formed. Not that Mr. Nicholas couldn't make money himself, but there was no evidence, particularly as to the foreign entities that they intended to go into business with a U.S. citizen to collect debts that they were unable to collect and wanted to sell. Should the test be that there's no non-tax purpose for the partnership, or should there be some kind of de minimis level? It needs to be more than a de minimis reason. I would say, Your Honor, it has to be more than de minimis. It has to be, you know, significant. The court determined here there was no evidence of any non-tax motive for the partnership form. I want to emphasize the government assumed for purposes of summary judgment that Mr. Nicholas expected that he could make money on collecting these debts. But there was no evidence that Chenery, and particularly the foreign entities, had any intent of joining together with him to go into the debt collection business. Can I ask one question before your time runs out? In Southgate, there's the statement that's at Headnote 14. I never can find these page numbers here. But it says they're talking about the partnership, sham partnerships. They say the party's selection of the partnership form must have been driven by a genuine business purpose. That's footnote, Cite's footnote 61. Okay, it goes on to say, It is only to say that tax considerations cannot be the only reason for a partnership's formation. If there was not a legitimate profit-motivated reason to operate as a partnership, then the partnership will be disregarded for tax purposes, even if it engaged in transactions that had economic substance. So one can seize on the, as they do, the only reason, and I think this may be what Judge Freeland was driving at, if they come up with some reason, but it's, you know, such a peripheral reason, but do we take Southgate's terminology literally, or what's the government's reading of that? Well, I think in Southgate, the court determined that there was no non-tax reason, so it didn't have to parse it. Well, it said there was economic reason for the structure overall, but not for the partnership. We agree with that here. We did not challenge that the notion of Mr. Nicholas buying distressed debts because he thought he could make profit. We didn't challenge that. We're saying is the partnership to be respected because the partnership gives rise to the phony losses. We are accepting, we accepted for purposes of summary judgment that Mr. Nicholas thought he could make money by, you know, buying these debts and selling them. And we were saying they didn't introduce any evidence that these other parties intended to join together with Mr. Nicholas and go into the debt collection business. And the evidence, the documents show that all the foreign entities were interested in was selling their debts, and that's what they did. They got full fair market value for their debts. But here, if we think there's a potential fact dispute about whether there's a very tiny purpose of the partnership, would you argue that we should? Well, I don't think it's a tiny purpose, and I don't know what it was and what it would be. And I would emphasize again, their burden really was CINDRA was the one that owned these assets. They put them in, and then as preplanned, they were immediately bought out for the entire value of their assets. They needed to put on, if they wanted this to go to trial, they needed to put on evidence from CINDRA that we retained this, we insisted on this 1% interest because we thought we were going to make some more money on that. They didn't put on any evidence from CINDRA or any of the other foreign entities. Nothing about, you know, did they get this 1% interest because they didn't care about it and wanted to accommodate Mr. Nicholas's tax avoidance, or did they really think this 1% was going to turn into money? There's no evidence whatsoever from their viewpoint. And the promoters who promoted this thing ignored the foreign entities and said these were sole investor funds, we're going to keep 1% to manage them, and ignored completely that the foreign entities were left with 1%. There was no discussion of we're all going to join together and everybody's, the foreign entities think they're going to make some money on their 1%. Counselor, you're over your time. Thank you very much. Thank you very much. I apologize, we've taken you over your time by questioning. Your Honors, I would like to make three points briefly. First of all, the record is replete with evidence that there were checks and there were distributions. Where is that evidence? It's in our record. Where in the record? Forgive me if I don't recall the page number right now. Second, the repeated references to the fact that the sellers were motivated to sell the inference actually, and we're allowed all reasonable inferences being at the summary judgment phase, is because they were under pressure from IMF and other regulators, and they wanted to clear their portfolio of bad loans. They would sell them at below market value. That's point number two. Point number three, the government fundamentally misconstrues where we're at. Aside from the fact that in Southgate you had a lengthy trial, the Court of Appeals, the Fifth Circuit, spent over 5,000 words balancing different factors involved in the Culbertson test. At this point in time, we have two problems. One, because of the way the government drove its case below. We had not had an opportunity to make a perfect record, and as this court did in Bolker and D.C. Circuit did in Saba, the lack of a... Why do you say you didn't have the opportunity? You could have submitted whatever evidence you wanted in opposition to their summary judgment motion, and the district court instead said that you didn't cite your evidence and you submitted expert reports for the wrong purposes, and the district court had all kinds of problems, but you could have done it correctly if you wanted to? Well, first of all, this very court, Your Honor, said in Bolker that it is not the fault of the non-moving party if it did not tailor its record perfectly because... You had the burden, based on the IRS decision, to prove that the partnership wasn't a sham, so where's your evidence? And we have put forward more than enough evidence. That's a conclusion. You can't cite the transcript on the others, so where is... The government is making a specific point, staking its case perhaps, on whether you can show that the foreign members of this partnership were anything other than a sham. Where is any evidence from the partnership, those partners, in the record, to show why they entered into the partnership when they'd been cashed out and had a nominal 1% interest, even if it's theoretically a powerful thing, when it's clear on the face of it it's probably not going to get $300 million. There are two points. One, a matter of law. One, a matter of fact. Matter of fact, we have put forward evidence that over $3 million were collected, that the partners participate in the collections, that they experience losses with regard to emossment funds. Where's the evidence that the SINDA people got a percentage of that as a partner? Yes, the government is wrong with respect. There's no indication in the record, and they have not even argued that. The government says that all you did was make book entries. You say that there were cash distributions, but you have not given us a citation of the record as to where we can find that. We have information in the record, Your Honor, that there were checks. I think you need to point us to that, please. And what other evidence is there? The government makes a big point of this, that they didn't put any deposition evidence that either the foreign banks or Chenery had any interest in sharing profits and losses from the recovery of these distressed loans. What's the evidence of that? This is now the point I was going to make to Judge Fischer. The government is making an argument of law. The government says that if you had a partnership interest that was X, and you sold most of it, you retained enough of a partnership interest, and, of course, you got paid a fair price for the partnership interest, merely because you retained a very small partnership interest. You have no more economic purpose sufficient to sustain the existence of a partnership. Your Honor, that flies in the evidence of the existence of numerous partnerships, some of which have nothing to do with distressed debt, including many law firms. But I don't think they're saying it can never be a partnership if they only have 1%. I think they're saying that you needed to present evidence that the foreign entity actually retained some interest that they cared about, and they could have submitted a declaration to that effect. They could have submitted internal documents showing that that's why they did it, but the government is saying you didn't submit any evidence like that. Two points, Judge Breland. First of all, the government below never focused at all on the interest of foreign partners. Well, I think they argued that there's no evidence, after a long discovery, that there was no evidence in the record that this partnership had a real purpose. And then you have the obligation, the burden shifts to you, to show where in the record there is such evidence. And that was your burden in opposing summary judgment, and I don't see where you did that. And the district court was clearly very frustrated with what you offered at that point. Two points. Our burden was in opposing the summary judgment as sought by the government on the grounds the government put forward, point number one. Point number two, I heard the government concede just a few minutes ago that they're not disputing that the foreign partners retain 1% interest. What they're really suggesting is that this was somehow, in their appellate brief, that this was somehow a de minimis interest that was sufficient, and some of your honest questions went to the same effect. I would argue that what is de minimis is very much a question of a trier fact, not for the judge in his presiding capacity, point number one. And point number two. But they're also, I mean, I was leading them toward asking about a test that might have a de minimis exception, but they're saying there actually is no evidence in the record about what these foreign partners' interests were, and you still haven't pointed us to anything responsive to that. No, but forgive me, Judge Freeland, I'm not sure I understand, and I apologize. The government is not disputing that foreign partners retain very small interest relative to Mr. Nicholas's. There's nothing wrong with a partnership where partners have asymmetrical interests. There are partners where you come in and, in fact, you have very little, if any, risk of loss, which is a kind of a Culbertson standard you put in the sweat equity because you expect to experience the tremendous upside. So you have a partnership, a proper partnership agreement, that operated as a partnership in good faith to collect on those assets, and our fault is not to put forward some indication of a subjective motivation in the form of a declaration by a foreign partner that they really, really wanted to make the money in a situation where the partnership was trying to make the money. That is a kind of more of a reasonable inference, I think, goes in our favor at the summary judgment phase. So, again, the partners who are— Why not, though? I mean, it's not that hard to have a declaration from any— I don't even see it from Nicholas here. They seem to be willing to give it to you, to assume that for this purpose. But where do we have any evidence that any of these partners actually thought there was a chance of making money here, entered the partnership so that they could use the partnership form to make money here? I mean, it's not that hard to just write a declaration that says any of those things, but I don't see that here or to say it in a deposition or anything else. I'm not quite sure. The fact that there is a 1% when they're saying, like, that doesn't really show any intent. Why didn't anyone just say this was our intent? Judge Freeland, I appreciate the question. If I may very briefly, and I apologize and I'm over my time, give you the best possible answer. The best possible answer is this. We have a partnership where people entered and retained throughout the operation of a partnership some interest, albeit asymmetrical. We had a partnership that engaged in collection efforts and distressed debt against the backdrop of discussions and literature that showed tremendous recovery. To me, the natural inference, human beings being motivated by the profit motive, and they involved in such partnership, and then they bring different assets to bear and capabilities. One of the reasons, by the way, the government refuses to acknowledge, and it is in the record, the reason you want foreign partners like CINDA is because they have certain unique abilities that an American investor, even a very sophisticated investor, cannot go and replicate by himself overseas. So in that situation, the notion that we have to put forward an attestation that we really, really wanted to make money, particularly at the summary judgment phase, seems to require more than we are obliged to do. So we had a partnership that had good prospects of making money for everybody. We had a partnership where people together with different capabilities that they could not replicate on their own, and they actually tried to make money and ended up losing money. The fact that that, to me, is all we really need at the summary judgment phase. So the partnership, the foreign entity was getting fees to do the collection, had already cashed out its financial interest here, so they retained the 1%, but their argument is the only reason to retain the 1% and to keep this partnership form is for the tax losses. Don't you once, I mean, don't you have an obligation to show that there was actually a purpose for the partnership form? I mean, saying that they had these skills is sort of responded to by the fact that they were getting paid fees for the skills, right? Judge Frillin, forgive me. In a situation where, again, picking up on the question asked by Judge Bayer, the fact that they sold out a large chunk of their partnership interest, but they retained a partnership interest, that, to me, creates no inferences whatsoever, number one. Number two, they retained an interest in the partnership. The partnership was operating for many years, and by the way, one of the reasons the government seeks to make hay out of the fact that Ms. Nichols was not a partner, but the reason for it is precisely this was meant to go for the long haul. If you actually look at the prospectus, it mentions that, that you do not want to be pressured by other partners whose circumstance may be different from yours. But so the foreign partners retain 1% interest. Given an opportunity of tremendous recovery, they stood to make a lot of money. Did they get cash out? Have you figured that out? Have your colleagues figured that out? Forgive me. Recorded in their tax return, and we have an evidence of one check being issued. Where is that check in the record? Can you tell me so I can look at it? It was page 181. But the broader point here, again, is, and I want to emphasize this, this is a very complicated all facts and circumstances issue. We have not had. Wait, ER 181? Yes. I think ER 181 is just a thing that says exhibit 1986. What ER page? I mean, that's what I see at 181, just a cover page that says exhibit 1986. 346. But we have a very complicated balancing test, which, as I mentioned again, took place. Wait a second. So this check is to Broadwood Investment Holdings. How does that show a payout to the foreign investor? Isn't that Nicholas's entity? Well, there's also evidence. We have evidence in the record which show the entries for the foreign partners. What do you mean by that? Well, the tax returns.  We have evidence in the record that show K1s for the foreign partners would show on an annual basis what their allocational profits and losses were. Can you tell us where those are and how they actually show the payout? Give me a second. ER 293. ER 293? Right. And 295. It looks like it's negative. I mean, did they actually get a payout? Well, the experience loss is your honor. Okay? There were no profits made by the partnerships. But what it shows is the participation of not only Mr. Nicholas, but foreign partners in the partnership losses or profits of both, which is the very essence of a Culbertson test. The partnership recognition cannot be viewed differently because the partnerships are staying losses, in which case the partners were allocated losses and have sustained profits. That is the black letter law. I think we're taking you way beyond your time, Mr. Rifkin. Thank you very much. Thank you, Mr. Farber, for your presentation. The case of Broadwood Investment Fund versus U.S. will be submitted.
judges: Fisher, Bea, Friedland